**INDIAN OASIS–BABOQUIVARI UNIFIED SCHOOL DISTRICT NO. 40 OF PIMA COUNTY, ARIZONA; Whiteriver Unified School District No. 20 of Navajo County; Clifford Pablo, next best friend of Clifford Pablo, Jr.; Cynthia Parker, Guardian of David Parker; Edlina Thompson, next best friend of Nelson Lupe, Plaintiffs–Appellants,**

**v.**

**James Lee KIRK, in his official capacity as Treasurer of Pima County, Arizona; C. Diane Bishop, in her official capacity as Superintendent of Public Instruction for the State of Arizona; Anita Lohr, in her official capacity as County School Superintendent for Pima County, Arizona; J.R. Despain in his official capacity as Treasurer of Navajo County, Arizona; William Bennett, in his official capacity as County School Superintendent for Navajo County, Arizona, Defendants–Appellees.**

No. 93–16089.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 15, 1994.

Submission Vacated Jan. 9, 1995.

Resubmitted Jan. 31, 1995.

Decided July 31, 1996.

John R. McDonald, Deconcini, McDonald, Brammer, Yetwin & Lacy, Tucson, Arizona; and C. Benson Hufford, Hufford, Horstman, McCullough & Mongini, Flagstaff, Arizona, for plaintiffs-appellants.

Anthony B. Ching, Deputy Attorney General, Phoenix, Arizona, for defendants-appellees.

Before: REINHARDT, WIGGINS,* and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Two Arizona public school districts and several of their students brought suit in federal court against the Arizona Superintendent of Public Instruction and the county treasurers and school superintendents of Pima and Navajo Counties seeking declaratory and injunctive relief holding that A.R.S. § 15–991.02, which requires county treasurers to remit a portion of a school district's ending cash balance to a state fund used for equalization among rich and poor districts, violates the Federal Impact Aid Law, 20 U.S.C. §§ 236–244, and the Supremacy Clause in Article VI of the United States Constitution, by taking some of their federal Impact Aid funds.[1] The district court dismissed the complaint on the ground that the districts are political subdivisions of the State of Arizona that lack standing to sue the state in federal court, and the students failed to allege distinct injury that is not derivative of the injury alleged by the school districts. It gave the students leave to amend, but they elected to appeal instead. We agree that neither the school districts nor the students have standing to bring this suit, and we therefore affirm.

---

* Judge Wiggins was drawn to replace Judge Tang. He has read the briefs, reviewed the record, and listened to the tape of oral argument held on December 15, 1994.

1. The students' claims are formally brought by their parents or guardians. We will refer to the State Superintendent, and the county treasurers and superintendents collectively as the "state."

## I

The Indian Oasis–Baboquivari and Whiteriver Unified School Districts receive federal funds under the Impact Aid law. The federal law was enacted to compensate local school districts whose finances are impacted negatively by federal activities in the area. Among those eligible for Impact Aid are school districts, such as Indian Oasis and Whiteriver, serving pupils who live on Indian reservations.

Arizona had a complicated procedure for equalizing funding among its school districts. A.R.S. § 15–991.02 was enacted in 1992 as a supplement to its equalization assistance legislation. It required county treasurers to remit a portion of the ending cash balance in the school districts' maintenance and operation funds for use by the state for equalization assistance.

Both school districts and three of their students brought this suit to challenge the constitutionality of § 15–991.02. The complaint alleges that § 15–991.02 has the effect of taking a portion of the funds the districts got from the federal government pursuant to the federal Impact Aid Law because the state statute includes Impact Aid within the calculation of funds that must be remitted to the state for state equalization purposes. This, they contend, violates the federal statute and the Supremacy Clause, and will cause irreparable harm in that without those funds, the districts will have to curtail important programs and projects.

The state moved to dismiss the complaint for lack of standing. The district court held that under *City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231 (9th Cir.), *cert. denied*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980), the school districts, which are creatures of the Arizona constitution and state statutes, lack the independent identity necessary to confer standing to assert a claim against the state in federal court. It likewise found the students' allegations of personalized injury deficient, and granted the state's motion to dismiss with leave to amend.

## II

### A

Indian Oasis and Whiteriver acknowledge the general rule of political subdivision standing doctrine that prohibits a political subdivision from bringing suit against the state of which it is a part, but argue that we should recognize an exception to the rule for constitutional challenges under the Supremacy Clause. They submit that the rule itself stems from cases involving individual rights, such as due process or equal protection, and should not be applied to claims that a state law interferes with federal law. Otherwise, the districts contend, they are powerless to challenge the state's violation of federal law in a federal court.

As the district court concluded, however, the districts' argument is foreclosed by *South Lake Tahoe*, which is controlling authority in this circuit. In that case, the City of South Lake Tahoe alleged that land use regulations adopted by the California Tahoe Regional Planning Agency violated the Fifth and Fourteenth Amendments, and conflicted with the plans and ordinances of the Tahoe Regional Planning Agency, a bistate agency approved by Congress, in violation of the Supremacy Clause. We held that the City, as a political subdivision of the state, could not challenge the statutes of the state itself, or one of its other political subdivisions, on constitutional grounds. Accordingly, we concluded, the standing component of federal jurisdiction was lacking and the City's claims, based on the Constitution, were properly dismissed.

Because a panel of this circuit may not overturn circuit precedent "unless an en banc decision, Supreme Court decision, or subsequent legislation undermines those decisions," *Clow v. United States Dept. of Housing & Urban Dev.*, 948 F.2d 614, 616 n. 2 (9th Cir.1991) (quoting *United States v. Washington*, 872 F.2d 874, 880 (9th Cir. 1989)), we are not free to consider the school districts' contention that decisions of other courts to the contrary are better reasoned. *See, e.g., Rogers v. Brockette*, 588 F.2d 1057 (5th Cir.) (recognizing school district's standing to bring a Supremacy Clause challenge to

a state law requiring school district to participate in a federally-subsidized school breakfast program), *cert. denied,* 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979); *San Diego Unified Port District v. Gianturco,* 457 F.Supp. 283 (S.D.Cal.1978), *aff'd on other grounds,* 651 F.2d 1306 (9th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982). Urging us to heed criticism of *South Lake Tahoe* by the California Supreme Court, *see Star–Kist Foods, Inc. v. County of Los Angeles,* 42 Cal.3d 1, 227 Cal.Rptr. 391, 719 P.2d 987 (1986), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 758 (1987), or by Justices White and Marshall dissenting from the Court's failure to grant certiorari, *South Lake Tahoe,* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502, or from another panel, *Gianturco,* 651 F.2d at 1309 n. 7, is likewise unavailing. We must follow *South Lake Tahoe*—right or wrong—unless intervening authority undermines the decision.

### B

Assuming that we do feel constrained by *South Lake Tahoe,* Indian Oasis and Whiteriver alternatively contend that it is no longer good law in light of *Lawrence County v. Lead–Deadwood School District,* 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985), and *Washington v. Seattle School District,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). Although neither opinion directly overrules *South Lake Tahoe,* the school districts contend that both necessarily undercut it because the Court reached the merits of a constitutional challenge by a political subdivision to state law and must thereby have implicitly decided that the subdivision had standing to pursue a constitutional claim against the state.

In *Lead–Deadwood,* the Supreme Court of South Dakota had sustained a state statute regulating distribution of funds that units of local government received from the federal government. The United States Supreme Court concluded that Congress intended local governments to have more discretion in spending federal aid than the State would allow them, and therefore held that the statute was invalid under the Supremacy Clause.

In *Seattle School District,* school districts disgruntled with an Initiative that would have prohibited busing for desegregation purposes, sought to prevent the state from enforcing it on the ground that to do so would offend the Equal Protection Clause of the Fourteenth Amendment. Holding that the Initiative violated the Constitution, the Court went on to consider the state's argument that attorney's fees should not have been awarded to the school districts because state-funded entities are not eligible to receive such awards from the state. *Seattle School Dist.,* 458 U.S. at 487 n. 31, 102 S.Ct. at 3204 n. 31. The Court stated that "[t]he Districts are plainly parties covered by the language of the fees statutes," *id.,* and affirmed on this point.

We have no difficulty dismissing the impact of *Lead–Deadwood,* as the suit by a political subdivision in that case was brought and litigated in state court, and was decided before *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), which clarified the effect of standing law on cases arising in state court. *Seattle School District* presents a closer question, because by affirming the award of attorney's fees to the school district, the Court arguably addressed claims that would be barred by the standing rule of *South Lake Tahoe.*

■ It is well settled, however, that the exercise of jurisdiction in a case is not precedent for the existence of jurisdiction. In *United States v. Los Angeles Tucker Truck Lines, Inc.,* 344 U.S. 33, 38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952), the Supreme Court stated with respect to the effect of an opinion where the merits were resolved—but where jurisdiction was not raised or addressed—on the determination of whether jurisdiction in fact exists when raised in a later case:

> The effect of the omission was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not a binding precedent on this point. Even as to our own judicial power or jurisdiction, this Court has followed the lead of Mr. Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it

was not questioned and it was passed *sub silentio.*

*Id.* (footnote omitted). We have similarly declined to give controlling weight to our own implicit holdings. *See, e.g., Service Employ. Int'l Union Local 102 v. San Diego (SEIU),* 35 F.3d 483, 489 (9th Cir.1994) (rejecting argument that we could not invalidate a regulatory salary test because it was inconsistent with other federal court decisions applying the test in the public sector because "[n]one of these cases considered or decided the validity of the regulation as applied to the public sector"); *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285, 1289 (9th Cir. 1985) (citing cases).

We see no reason why *Tucker Truck* should apply only when a court considers its own prior decisions, but not when an appellate court considers the decisions of the Supreme Court. Two circuits that have explicitly reached the question have so concluded. *Grant v. Shalala,* 989 F.2d 1332, 1341 (3d Cir.1993) (refusing to follow alleged implicit holding of Supreme Court case because in prior case power of district court to make findings was not challenged); *Cousins v. Secretary of the U.S. Dept. of Transp.,* 880 F.2d 603, 608 (1st Cir.1989) (en banc) (relying on *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925) for nonbinding nature of questions "which merely lurk in the record").

Given the fact that we have explicit precedent on the point of political subdivision standing, and that the Supreme Court has never directly considered the issue, we cannot say that the weight of its implicit exercise of jurisdiction is sufficiently powerful to undermine the law by which we are bound.[2] We therefore remain obliged to follow *South Lake Tahoe.* So bound, we conclude that the school districts lack standing to bring this claim based on the Supremacy Clause in federal court, and that their action was properly dismissed.[3]

## III

■ The students also fault the district court for dismissing their complaint, arguing that other federal courts have recognized that students have standing to challenge state laws that have an adverse effect on their education and that the allegations in their complaint suffice to show more than a generalized grievance. Before considering these arguments, however, we must first dispose of the state's position that the students' appeal is premature—and we therefore lack jurisdiction over it—because the district court's order was not a final judgment dismissing the action. While the district court did dismiss the complaint without prejudice, and with leave to amend, the students decided not to take advantage of that opportunity. When a plaintiff chooses to stand on the pleadings, an otherwise unappealable order with leave to amend may be appealed. *Carson Harbor Village Ltd. v. City of Carson,* 37 F.3d 468, 471 n. 3 (9th Cir.1994); *McGuckin v. Smith,* 974 F.2d 1050, 1053 (9th Cir.1992). But the students, and we, are stuck with what they actually alleged, not with what they possibly could have alleged had they actually filed an amended pleading.

■ The district court held, and we agree, that their allegations fall short of averring personalized injury to themselves from the state's enforcing § 15–991.02. "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 563, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)). *Defenders* emphasizes that to have standing a plaintiff must have suffered a concrete and particularized injury; "particularized" means "that the injury must affect the plaintiff in a personal and individual way." *Id.,* 504 U.S. at 560 & n. 1, 112 S.Ct. at 2136 & n. 1; *see also United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)

---

2. This distinguishes our case from *Board of Natural Resources v. Brown,* 992 F.2d 937 (9th Cir. 1993), where there was no Ninth Circuit precedent directly on point.

3. We accordingly do not reach the state's argument that the Impact Aid Act provides no private right of action and confers no right on political subdivisions to sue the state.

(pleading must allege specific and perceptible harm that distinguishes plaintiff from other citizens).

The complaint simply alleges that "Clifford Pablo Jr. is a student in Indian Oasis School district, David Parker and Nelson Lupe are students in Whiteriver School District." It avers that "plaintiffs will be irreparably harmed if its funds are transferred to the Equalization Fund ..." because there is no mechanism for restoring these monies to the local district and the court would lose jurisdiction over a portion of the case. However, "plaintiffs" in this sense must refer to the school district, as the students have no funds subject to transfer. The complaint further alleges that Whiteriver "and its students" will be irreparably harmed because the transfer of funds will jeopardize the continued receipt of federal funding, building plans and renovations to the Middle School, and capital outlay projects, forcing it to continue to work with inadequate facilities.

None of the three students has alleged a program that affects him as an individual that will be scaled back. Nor does the complaint even indicate if Lupe or Parker (who are students of Whiteriver) are of an age or live in an area where they could benefit from a new elementary school, or if either of them attends the Middle School where there is a chronic problem with the boiler that additional funds might fix. Indeed, the complaint fails to allege that these students are among the 92% of Whiteriver students who are eligible for and benefit from Impact Aid programs. Thus, the complaint affords no basis for presuming that these three students suffer particularized harm or distinct injury.

The difficulty is that we, like the district court, intuitively feel that students are in a position to suffer tangible injuries from a decrease in funding. The problem is that *these* students simply ride the districts' coattails and aver no facts that suggest direct, distinct and tangible injury to themselves. They chose not to try, and we therefore have no occasion to consider under what circumstances students might have standing.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

In today's decision, the majority bars both local school districts and their students from challenging the state's alleged violation of federal law and improper diversion of federal funds designed to assure a full and fair education to local students in impoverished districts. In denying these parties access to the federal courts, the majority continues a dangerous and unfortunate trend insulating arbitrary and unlawful governmental action from full and fair review. Here, the majority goes too far when it bars on jurisdictional grounds all federal suits against the state by local governmental entities and political subdivision of the state. It also errs in construing the students' pleadings in a narrow, grudging, hypertechnical, and illiberal fashion that results in the dismissal of their claims as well.

The majority concludes that two Arizona school districts lack standing to bring suit in federal court to prevent enforcement of a state statute that allegedly violates federal law. I agree that our earlier decision in *South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231 (9th Cir.), *cert. denied*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980), would bar this action if that erroneously decided case had not been tacitly overturned by the Supreme Court's holding in *Washington v. Seattle School District, No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) and if we had not previously recognized that implicit holding in *Board of Natural Resources v. Brown*, 992 F.2d 937 (9th Cir.1993). The majority also concludes that the student plaintiffs lack standing because they purportedly did not assert a concrete injury even though they alleged that enforcement of the state law would deprive their districts of thousands of dollars and compel them to curtail important school-wide school programs.

Because the majority's analysis contravenes *Seattle School District* and creates both an inter-circuit and an intra-circuit conflict, I respectfully dissent from its holding regarding the school districts. Because the opinion fails to construe the students' pleadings in their favor, I dissent from that part of the opinion as well.

*I.*

*A.*

The majority concludes that our decision in *City of South Lake Tahoe* bars the school districts, which are creatures of the state constitution and state law, from bringing suit against their maker. In that case, South Lake Tahoe claimed that a state agency's regulations violated several federal constitutional provisions, ranging from the Fourteenth Amendment to the Supremacy Clause. *Id.* at 231–32. In dismissing the city's claims, we held that political subdivisions lack standing to raise federal constitutional challenges against their state. *Id.* at 233–34.

*South Lake Tahoe* did not explain whether concerns about the standing of political subdivisions or concerns about the constitutional rights they possess underlay its holding. The court discussed the issue in a section of the opinion that concerned its jurisdiction and was entitled "The City's Standing". *Id.* at 233. However, it made no reference to the usual standing criteria, and its reasoning, although elliptic, appears to be addressed to whether the city possessed a cause of action.[1] Its sole paragraph addressing the "standing" issue states:

> It is well established that "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." This is true whether the defendant is the state itself or another

of the state's political subdivisions. Thus, the city may not challenge the [state agency's] plans and ordinances on constitutional grounds. Because all of its claims are based on the Constitution, the City's challenge was properly dismissed.

*South Lake Tahoe*, 625 F.2d at 233–34 (citations omitted).[2] It is not necessary to decide whether *South Lake Tahoe* is a standing case or a cause of action case, for under either interpretation *South Lake Tahoe* would clearly bar political subdivisions from bringing the kind of federal constitutional challenge raised by Indian Oasis and Whiteriver.

Ordinarily, we would be bound to apply *South Lake Tahoe* as the controlling Ninth Circuit precedent, and thus we would be required to affirm the district court's dismissal of the school districts' claims. However, the districts point out that the Supreme Court's subsequent decision in *Washington v. Seattle School District, No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), invalidates the basis for *South Lake Tahoe*'s holding. While their conclusion is correct, because of the uncertainty regarding the basis for that decision, it is necessary to examine the effect of *Seattle School District* on two separate propositions: first, the proposition that a *per se* bar precludes political subdivisions from establishing standing in federal constitutional challenges against their states; and second, the proposition that a *per se* bar prevents them from asserting a cause of

---

1. Federal courts sometimes characterize their inquiry into whether the plaintiff has a cause of action as one that concerns the party's "standing". Despite the fact that courts occasionally (and perhaps inadvertently) use the term "standing" when undertaking such inquiries, the Supreme Court has made it clear that the question whether a party has standing is distinct from the question whether it has asserted a valid cause of action. *See Davis v. Passman*, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979); *see also Dennis v. Higgins*, 498 U.S. 439, 461, 111 S.Ct. 865, 878, 112 L.Ed.2d 969 (1991) (Kennedy, J., dissenting) (distinguishing between "standing" and "cause of action").

   The former question concerns "whether a plaintiff is sufficiently adversary to a defendant to create an Article III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction[.]" *Davis*, 442 U.S. at 239

n. 18, 99 S.Ct. at 2274 n. 18. The latter question concerns whether a plaintiff may, as a matter of law, "use the courts to enforce the right at issue. The focus must therefore be on the nature of the right petitioner asserts." *Id.* Standing is generally held to be jurisdictional, while the question whether a cause of action exists is not. *See Janicki Logging Co. v. Mateer*, 42 F.3d 561, 563 (9th Cir.1994) (citing *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). In analyzing the plaintiffs' claims here, I follow the Court's distinction between establishing standing and asserting a valid cause of action.

2. The inquiry into whether a party has standing to sue also differs from the inquiry into whether it has the capacity to sue. Here, there is no doubt that under state law, Arizona school districts have the capacity to sue their states. *See* A.R.S. §§ 15–326 and 15–444.

action in such cases.[3] In both cases, it is clear that *South Lake Tahoe*'s ruling does not survive *Seattle School District.*

### B.

#### 1.

In *Seattle School District,* three Washington school districts sued their state to enjoin the enforcement of a statewide voter initiative that shifted control over school busing plans from the local to the state level. The school districts contended that the initiative impeded school desegregation efforts in violation of the Fourteenth Amendment. *Seattle School District,* 458 U.S. at 459–67, 102 S.Ct. at 3189–93. The Supreme Court did not discuss whether the school districts had standing sufficient to secure federal-court jurisdiction, but it reached the merits of their constitutional claims nonetheless. On the merits, it ruled that the challenged state law was unconstitutional and that the Seattle School District was entitled to attorney's fees as a prevailing party in the litigation. *Id.* at 487 n. 31, 102 S.Ct. at 3204 n. 31.

*South Lake Tahoe*'s *per se* bar cannot be reconciled with *Seattle School District.* First, the *Seattle School District* Court could not have reached the merits of the school districts' constitutional challenge or their request for attorney's fees if the school districts had not met the standing requirements. Second, the *Seattle School District* Court would not have granted the relief it did if the school districts did not have the right to sue their state for violating the federal constitution. Thus, *Seattle School District* contradicts *South Lake Tahoe*'s holding whether it was based on the determination that political subdivisions lack standing in suits of the type before us or the conclusion that they have no cause of action against their states for a federal constitutional violation. Under the circumstances, we must apply the precedent of *Seattle School District* and not of the repudiated *South Lake Tahoe* ruling.

#### 2.

The majority asserts that *Seattle School District* assumed *sub silentio* that it had jurisdiction over the school districts' claim and that the case therefore cannot be read as repudiating *South Lake Tahoe*'s conclusion that political subdivisions lack *standing* to bring constitutional challenges against their states. This analysis is inconsistent both with *Seattle School District* itself and with our recent decision in *Board of Natural Resources v. Brown,* 992 F.2d 937, 942 (9th Cir.1993), a case the majority barely mentions.

Although the Court did not explicitly discuss the school districts' standing in *Seattle School District,* it did not pass over the issue *sub silentio* either. The Court noted that allowing school districts to collect attorney's fees from the state would encourage them to sue to ensure "compliance with and enforcement of the civil rights laws." *Seattle School District,* 458 U.S. at 487 n. 31, 102 S.Ct. at 3204 n. 31. (internal citation omitted). While rejecting the policy arguments for prohibiting a state agency from suing the state for attorney's fees and instead authorizing such suits, the Court made it clear that the school districts had standing to sue the state for the alleged Fourteenth Amendment violation. The Court said: "While appellants suggest that it is incongruous for a State to pay attorney's fees to one of its own school boards, it seems no less incongruous that a local board would feel the need to sue the State for a violation of the Fourteenth Amendment." *Id.* Although the Court does not squarely hold that the school districts have standing to sue the state, it in no way passed over the issue *sub silentio.* To the

---

**3.** *Cf. LeVick v. Skaggs Companies, Inc.,* 701 F.2d 777, 778 (9th Cir.1983) (permitting three-judge Ninth Circuit panel to reexamine controlling Ninth Circuit precedent on the basis of subsequent Supreme Court authority). I also note that ten years prior to *South Lake Tahoe,* we affirmed a district court decision which enjoined the state of California from withholding funds from some of its school districts on the ground that the Impact Aid law preempted it from doing so. *See Carlsbad Union School District of San Diego County v. Rafferty,* 429 F.2d 337, 339–40 (9th Cir.1970). In that case, the school districts were the sole plaintiffs. *Id.* at 338. However, our opinion made no mention of the "standing" issue that we consider here. *South Lake Tahoe* did not discuss *Carlsbad Union* nor purport to overrule it.

contrary, it made its position quite clear, and then ruled on the merits for the school districts.[4]

In *Board of Natural Resources v. Brown,* in trying to decide whether state agencies could mount an equal protection challenge under the Fifth Amendment against the federal government, we turned to *Seattle School District* for guidance. In reaching the merits of that case, the Court had reached *two implicit conclusions*—that the school districts had standing to sue the state notwithstanding their status as creatures of the state and that the school districts had standing to sue under the Equal Protection Clause because they were persons for purposes of the Fourteenth Amendment. In *Board of Natural Resources,* we found the second implicit standing conclusion (that the school districts were persons) to be controlling of the case before us. Here, the majority ignores the first implicit standing conclusion (that the school districts had standing to sue the state). I fail to see any justification for accepting one implicit conclusion as binding and rejecting the other as of no significance because it is implicit.

In *Board of Natural Resources v. Brown,* we concluded that the decision by the Court to reach the merits in *Seattle School District* constituted an implicit ruling that the school districts had standing to bring an equal protection challenge against the *state.* Specifically we said: "Although standing was not discussed, the Court reached the merits of the claim and thus implicitly found that school districts are persons for purposes of the Fourteenth Amendment." *Board of Natural Resources,* 992 F.2d at 942. We then followed that ruling as the law required us to do. As *Board of Natural Resources* makes clear, we were not considering whether state

agencies were persons in the abstract, but rather whether they were persons for purposes of standing, so that we could determine whether the agencies could proceed with an equal protection claim. In *Board of Natural Resources,* relying squarely on *Seattle School District*'s implicit ruling as to standing, we held that they were and that they could proceed; here, relying on a directly contrary analysis, that *Seattle School District*'s implicit standing ruling is without binding effect on us, the majority says the state agencies may not proceed, and claims that its holding is reconcilable with our earlier decision.

Because *Board of Natural Resources* answers the question of our obligation to rely on the standing ruling of *Seattle School District* and is binding upon us, the majority is not free to adopt an erroneous interpretation of *United States v. Los Angeles Tucker Truck Lines,* 344 U.S. 33, 38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952), use that interpretation to construe *Seattle School District* in a contrary manner, and in doing so create an intercircuit and intracircuit conflict. In *Tucker Truck,* the Court concluded that *it* was not bound by its *sub silentio* rulings. Even were it accurate to describe the implicit holding in *Seattle School District,* as a *sub silentio* ruling, unlike the majority, I am far from certain that the rule regarding the non-binding nature of *sub silentio* jurisdictional rulings applies to a lower court's obligations with respect to the Supreme Court, or even that the *Tucker Truck* rule limited or limits the Supreme Court's discretion in any way. The rule, to the extent that it may still be properly so described, states only that the Supreme Court is not bound by its own *sub silentio* decisions, but it does not preclude the Court from following them if it wishes to do so. It certainly does *not* say whether lower courts

**4.** The history of the case makes it even more unlikely that the Court would have passed over the issue of the school districts' standing *sub silentio.* As our opinion shows, the issue of standing was discussed extensively on appeal. *See Seattle School Dist. No. 1 v. State of Wash.,* 633 F.2d 1338, 1342 n. 1 (9th Cir.1980).

Moreover, we note that our decision in *Seattle School District* made no reference to *South Lake Tahoe* even though we decided *Seattle School District* almost exactly six months after *South Lake Tahoe* had set down the "per se" rule pre-

cluding such suits for lack of standing. Thus, before the case went to the Supreme Court, there was a clear conflict within the Circuit. *South Lake Tahoe* held that there was a clear rule against standing in all circumstances, while *Seattle School District* had clearly, albeit implicitly, held to the contrary. The Supreme Court's opinion in *Seattle School District* resolved the conflict in favor of the Ninth Circuit's *Seattle School District* decision and against our *South Lake Tahoe* opinion.

are bound by implicit decisions, particularly where the Court's opinion reveals that it was aware of the existence of the issue. *Los Angeles Tucker Truck,* 344 U.S. at 38, 73 S.Ct. at 69. Given the substantial number of cases in which the Court has treated its *sub silentio* decisions as controlling authority, I doubt that it would be appropriate for a lower court to assume that the Supreme Court had thoughtlessly come to an implicit conclusion and that we are thus free to ignore it. In a number of highly significant cases, dissenters have invoked to no avail the *Tucker Truck* rule on which the state relies. There is, therefore, a substantial question whether the "rule" is still viable in any regard. *See Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 2518, 125 L.Ed.2d 74 (1993) (basing decision on what prior Court decision "necessarily" but silently held); *Maine v. Thiboutot,* 448 U.S. 1, 5–6, 100 S.Ct. 2502, 2504–05, 65 L.Ed.2d 555 (1980) (relying on past cases in which § 1983 actions based on violations of federal statutory rights were permitted to go forward without comment in holding that such suits could be brought); *Monell v. Department of Social Servs. of the City of New York,* 436 U.S. 658, 678, 98 S.Ct. 2018, 2029, 56 L.Ed.2d 611 (1978) (relying on past cases that silently had held municipalities liable under § 1983 in holding that municipalities could be so held); *Florida Lime & Avocado Growers, Inc. v. Jacobsen,* 362 U.S. 73, 80–81, 80 S.Ct. 568, 573–74, 4 L.Ed.2d 568 (1960) (relying on past cases that silently conferred jurisdiction on three-judge panels to find such jurisdiction to lie).

The majority also relies on *Service Employ. Int'l Union Local 102 v. San Diego (SEIU),* 35 F.3d 483, 489 (9th Cir.1994) and *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285, 1289 (9th Cir.1985), to support the claim that "[w]e have similarly declined to give controlling weight to our own implicit holdings." Majority op. at 1244. Neither case is *remotely* on point. In *Service Employ. Int'l Union Local,* the union argued that because several cases had discussed the proper interpretation of a regulation, those case had *necessarily* held that the regulation was constitutional. *Id.* at 489. That claim was wholly without merit. We rejected it because the constitutionality of the regulation was not discussed, nor decided in those cases; nor was there any requirement that the Court consider that issue before deciding a question of statutory construction. *Id.* ("None of those cases considered or decided the validity of the regulation . .."). Here, the opposite is true. In *Seattle School District,* the Supreme Court *necessarily* determined that the school districts had standing because doing so was a jurisdictional prerequisite to providing the relief they requested and because federal courts are required *sua sponte* to determine the existence of jurisdiction before proceeding to the merits of the case. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' ").

*Sakamoto* is even less applicable. In that case, we held that Guam, as a territory, is not limited by the Commerce Clause in the same way states are. *Sakamoto,* 764 F.2d at 1286. In reaching our conclusion, we said that we were not bound by our prior decisions "assuming without discussion that the commerce clause limits the government of Guam in the same manner that it limits the states." *Id.* at 1287. We merely stated the obvious: we are not bound by an implied conclusion in a prior case concerning an issue that was not raised or decided and that we were not obligated to resolve in order to decide that case. In *Seattle School District,* however, the issue of school districts' standing was necessarily, albeit implicitly, decided. Any ambiguity about the Court's holding in that case was resolved by *Board of Natural Resources,* in which we explicitly concluded that the *Seattle School District* Court held that the school districts had standing to proceed with their equal protection claim.

Because *Board of Natural Resources* mandates our interpretation of *Seattle School District*'s holding on the standing question, I need not rely on my independent conclusion that the Court's implicit standing determina-

tion suffices to overrule *South Lake Tahoe*. Nevertheless, I express my unqualified agreement with the conclusion reached in *Board of Natural Resources: Seattle School District* held that the school districts were persons who had standing to sue their state.

Apart from *Board of Natural Resources,* the state suggests that the Supreme Court did not necessarily come to any conclusions regarding the standing of the school districts in *Seattle School District.* It contends that the *Seattle School District* Court could have based its jurisdiction solely on the standing of the private plaintiff-intervenors to the suit and thus would not have had to determine the standing of the school districts before reaching the merits of the constitutional question before it. The state is in error.

While *Board of Natural Resources* did not address the presence of the private plaintiffs in *Seattle School District,* it correctly concluded that the Court had implicitly conferred standing on the school districts. Although federal courts have jurisdiction if one plaintiff has standing to sue, they may only provide *relief* to those parties with *standing.* See *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 402 n. 22, 102 S.Ct. 3141, 3156 n. 22, 73 L.Ed.2d 835 (1982). In *Seattle School District,* the Court not only found a constitutional violation, but it specifically awarded relief in the form of attorney's fees to the School District. It could not have done so unless it had first concluded that the District had standing in its own right. *General Building,* 458 U.S. at 402 n. 22, 102 S.Ct. at 3156 n. 22; *see also Martinez v. Wilson,* 32 F.3d 1415, 1422 (9th Cir.1994) (explaining that a party must have standing in its own right to obtain attorney's fees). Thus, the Court implicitly but indubitably held that the District had standing.

I would also note that the majority's claim that the school districts lack standing to sue the state, Majority op. at 1241–42, is impossible to reconcile with modern standing doc-

trine. The districts unquestionably meet the three requirements of modern standing doctrine: injury-in-fact, causality, and redressability. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The majority does not and cannot explain why school districts should be denied standing to sue their states or how a per se bar on standing can be reconciled with *Lujan* or literally dozens of other modern standing cases. Rather than attempting to reach a decision that is consistent with controlling Supreme Court caselaw and sound constitutional principles, the majority opts for simply asserting a mechanical answer based on a single discredited Ninth Circuit opinion. It stubbornly and mistakenly reiterates that the appeal is governed by *South Lake Tahoe,* a case that is indefensible on its merits but more important has been implicitly but unequivocally overturned by *Seattle School District* as necessarily recognized by the subsequent Ninth Circuit decision in *Board of Natural Resources.*

*3.*

To the extent that *South Lake Tahoe* is read as holding that political subdivisions have no *cause of action* against their states for violations of the federal constitution, it likewise cannot survive *Seattle School District.* *Seattle School District* rejected the argument that the districts, by virtue of being political subdivisions, did not have a legal right to sue their state under the Constitution.[5] In affirming the lower court's award of attorney's fees, the Court expressly stated that a school district could enforce the Fourteenth Amendment against its state, saying:

> [w]hile appellants suggest that it is incongruous for a State to pay attorney's fees to one of its school boards, *it seems no less incongruous that a local board would feel the need to sue the State for a violation of the Fourteenth Amendment.* We see no

---

**5.** *See, e.g.,* State of Washington's Jurisdictional Statement, *Washington v. Seattle School District,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (No. 81–9) (arguing that Congress did not intend that school districts have the right to sue their states for attorney's fees for civil rights violations); Brief of Amici, States of Arizona,

Kansas, Nebraska, and Utah in Support of Jurisdictional Statement, *Washington v. Seattle School District,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (No. 81–9) (arguing that school districts, as political subdivisions, possess no Fourteenth Amendment rights).

reason to disturb the judgment of the Court of Appeals on this point.

*Seattle School District,* 458 U.S. at 487 n. 31, 102 S.Ct. at 3204 n. 31 (emphasis added). That holding directly rejects *South Lake Tahoe's* conclusion that political subdivisions may not "challenge" state laws under the Fourteenth Amendment, *see South Lake Tahoe,* 625 F.2d at 233, and thus the broader notion that, as a matter of substantive constitutional law, political subdivisions may not assert a cause of action against their states for a federal constitutional violation.

In any event, *Board of Natural Resources,* like other cases before it, treated the standing and cause of action requirements interchangeably, and seemed to consider them to be one and the same for purposes of determining whether the plaintiffs could sue. Unquestionably, that is how it viewed *Seattle School District.*[6] The result is that *Board of Natural Resources,* like *Seattle School District,* treated the question whether a political subdivision could sue its state to be a jurisdictional matter. Viewed in that light, *Board of Natural Resources* holds that in reaching the merits, *Seattle School District* implicitly resolved the cause of action question as well as the standing inquiry. Thus, *South Lake Tahoe* stands repudiated for that reason as well.

In holding that the plaintiffs' argument is foreclosed by *South Lake Tahoe,* the majority not only dismisses *Seattle School District* and the intra-circuit conflict it creates, but it also creates a square inter-circuit conflict. As the majority itself recognizes the Fifth Circuit has reached a diametrically opposite conclusion regarding school district standing. Majority opinion at 1241–1242 (also citing state and district court cases criticizing *South Lake Tahoe* ). In *Rogers v. Brockette,* 588 F.2d 1057 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979), the Fifth Circuit concluded that local school

districts have standing to bring a Supremacy Clause challenge to a state law that allegedly conflicted with a federal program. In a careful and scholarly opinion, the court explicitly held that state agencies had standing to sue their maker. After analyzing the allegedly contrary Supreme Court precedent, which I discuss below at pp. 1252–1254, the court held: "We conclude that the *Hunter* and *Trenton* line of cases do not, properly speaking, deal with a municipality's standing to sue the state that created it. Therefore they do not deny [the plaintiff school district] standing to bring this suit." 588 F.2d at 1071. The majority opinion also creates a direct conflict with the Fourth Circuit's decision in *School Bd. of the City of Richmond, Va. v. Baliles,* 829 F.2d 1308 (4th Cir.1987). In that case, the Fourth Circuit squarely held that a school district had standing to sue its state—although it did so without discussing the assertion that state-created agencies should not be able to sue their maker. The majority opinion also conflicts with those cases that hold that political subdivisions of a state have a cause of action in federal courts against the state for certain constitutional violations. Obviously, if there were a per se bar on standing, political subdivisions could not maintain a cause of action against the state for *any* violation. *See infra* note 10, listing cases. Thus, in addition to creating an unnecessary and undesirable jurisdictional barrier that undeservedly protects states against lawsuits by lesser governmental entities, the majority needlessly creates both a direct intra- and inter-circuit conflict and ignores a substantial number of cases that reach a contrary result.

### C.

The fact that *South Lake Tahoe's per se* bar has been removed and that *Seattle School District* holds that political subdivi-

---

6. In doing so, the court may have inadvertently demonstrated the maturing wisdom of Justice Douglas, who, having helped to create the distinctions between "cause of action" and "standing" in *Data Processing Serv. Orgns. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), soon thereafter became disenchanted with them. In *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), Justice Douglas wrote: "The Court phrases the question in terms of whether a 'right of action' exists, saying that no question of 'standing' or 'jurisdiction' is presented. Whatever the merits of the distinction between these three concepts may be in some situations, the difference here is only a matter of semantics." *Id.* at 467, 94 S.Ct. at 697 (Douglas, J., dissenting).

sions may establish standing to sue their state for federal constitutional violations does not mean, however, that the Indian Oasis and Whiteriver School Districts have established standing here. In order to do so, they must satisfy the constitutional and prudential standing requirements that apply to all plaintiffs. Similarly, while *Seattle School District* demonstrates that a school district may assert a federal constitutional cause of action against its state for race discrimination under the Fourteenth Amendment, it does not necessarily mean that such entities may sue their state under the Supremacy Clause. Those are questions that the majority did not reach but which I am required to explore further.

### D.

The three constitutional standing requirements that plaintiffs must satisfy are injury-in-fact, causation, and redressability. In this case, I have no doubt that the allegations of the school districts are sufficient to meet those requirements. They assert that they will lose a portion of their Federal Impact Aid funds if the state of Arizona enforces its state statute. By claiming a "direct, pocketbook injury," the school districts satisfy the injury-in-fact requirement of Article III standing. *See Barrows v. Jackson,* 346 U.S. 249, 255–56, 73 S.Ct. 1031, 1034–35, 97 L.Ed. 1586 (1953); *see also Board of Natural Resources,* 992 F.2d at 945 (finding "substantial loss of revenue" sufficient to show injury). Moreover, the school districts contend that they will lose their federal funds only if the state enforces A.R.S. § 15–991.02; thus, their injury is "fairly traceable" to the state's enforcement of the statute in question and meets the causation requirement. *Id.* at 945.

Finally, the school districts meet the redressability requirement. The only possible question here is whether, because the state has the legal authority to abolish the school districts, any judicial decision in this case would be advisory. However, the Fifth Circuit has convincingly rejected this argument and concluded that a school district's preemption claim against its state is redressable. *Rogers,* 588 F.2d at 1064; *cf. United States v. Nixon,* 418 U.S. 683, 695–97, 94 S.Ct. 3090,

3101–02, 41 L.Ed.2d 1039 (1974) (holding a suit between the President and the Watergate Special Prosecutor justiciable even though the president could fire the prosecutor). I agree. The theoretical possibility of abolition is far too remote a factor to warrant deeming the school districts' injury unredressable.

The school districts' pleadings also satisfy the prudential standing requirements set forth in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). The school districts are clearly asserting their own rights, as the federal funds in question are kept in their own coffers. For the same reason, the school districts are not asserting a generalized grievance. Finally, I conclude that the school districts are "arguably within the zone of interests" protected by "the federal guarantee in question." *Association of Data Processing Serv. Orgns v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

For purposes of applying the *Data Processing* test, I assume that the plaintiffs have a valid cause of action and consider only whether they are protected by the "federal guarantee in question." *See Self–Insurance Institute v. Korioth,* 993 F.2d 479, 484 (5th Cir.1993). Although the caselaw is less than clear as to whether the relevant "federal guarantee" in a suit of the type before us is the Supremacy Clause itself, the underlying preemptive federal statute, or both, I need not decide that question. Because the "zone of interests" test is not a "demanding" one to meet, *see Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987), I conclude that the school districts fall within the zone of interests of both the Supremacy Clause and the Impact Aid law.

The school districts are suing to preclude the enforcement of a state law which they contend violates federal law; thus, their claims arise directly under the Supremacy Clause and necessarily "come within the zone of interests protected by the [that] Clause."

*ANR Pipeline v. Corporation Comm'n,* 860 F.2d 1571, 1579 (10th Cir.1988). Moreover, the school districts are within the zone of interests protected by the Impact Aid law as the federal statute specifically identifies local school districts as being among its intended beneficiaries. *See Self–Insurance Institute,* 993 F.2d at 484 (concluding that plaintiffs satisfied the zone of interests test in a Supremacy Clause challenge involving ERISA because the federal statute "specifically enumerated" the plaintiffs). Accordingly, the prudential as well as the constitutional standing requirements are satisfied.

### E.

Having concluded that the school districts have standing to sue, I now address the question whether they may assert a valid cause of action against their state under the Supremacy Clause. Although *Seattle School District* establishes that there is no *per se* bar to such constitutional actions, the state relies on an early line of Supreme Court cases which sets forth specific limits on the kinds of challenges that may be brought by municipalities and similar entities. In my opinion, those early cases do not foreclose the challenge at issue here.

The line of cases begins with *Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819),[7] in which Chief Justice Marshall articulated the view that in many respects states had the right to exercise unfettered control over their political subdivisions. He explained that:

> [i]f the act of incorporation be a grant of political power, if it create a civil institution, to be employed in the administration of government ... the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of power imposed by the constitution of the United States.

*Dartmouth College,* 17 U.S. (4 Wheat.) at 629–30.

Almost a century later, *Hunter* adopted a similar view. It declared that municipal corporations, as political subdivisions of the state, are largely subject to their creator's will and thus without federal constitutional protection in many respects.

> The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter, and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States.

---

7. The cases are commonly referred to as the *Hunter* line of authority, after *Hunter v. Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1908). *South Lake Tahoe* relied on several of these cases: *Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *City of Newark v. New Jersey,* 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923); *City of Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); and *City of New Orleans v. New Orleans Water–Works Company,* 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943 (1891). *See South Lake Tahoe,* 625 F.2d at 233. Other cases in the *Hunter* line are: *Railroad Commission of California v. Los Angeles Railway Corporation,* 280 U.S. 145, 50 S.Ct. 71, 74 L.Ed. 234 (1929); *City of Pawhuska v. Pawhuska Oil and Gas Company,* 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054 (1919); *Williams v. Eggleston,* 170 U.S. 304, 18 S.Ct. 617, 42 L.Ed. 1047 (1898); *Mount Pleasant v. Beckwith,* 100 U.S. 514, 25 L.Ed. 699 (1879); and *Laramie County Com'rs v. Albany County,* 92 U.S. 307, 23 L.Ed. 552 (1875). *See generally,* Gerald Frug, *The City As a Legal Concept,* 93 Harv.L.Rev 1057 (1980).

Although the *Hunter* cases occasionally make reference to the "standing" of political subdivisions, the Fifth Circuit has convincingly explained that the cases are better understood as cases concerning whether a cause of action exists. At the time the cases were decided, "standing" did not have the technical jurisdictional meaning that it does today. Thus, in concluding that political subdivisions lacked "standing," the Court "meant only that, on the merits, the municipality had no rights under the particular constitutional provision it invoked." *Rogers,* 588 F.2d at 1070.

*Hunter*, 207 U.S. at 178–79, 28 S.Ct. at 46.[8]

Although *Dartmouth College* and *Hunter* appeared to set forth an expansive view of state power, and thus a narrow view of the constitutional protections afforded to municipal agencies, the Court subsequently explained the limitations implicit in those decisions. In *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the Court reviewed the line of authority running from *Dartmouth College* through the *Hunter* cases and concluded that the Court's occasional rhetorical flourishes to the contrary were just that:

> [i]t is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts. Thus, a correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the state's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

*Gomillion*, 364 U.S. at 344, 81 S.Ct. at 128. While *Gomillion* did not involve a suit between a state and a political subdivision, that fact is of no consequence.[9] Its analysis of all of the Court's early cases that involve constitutional challenges "regarding legislation by States dealing with their political subdivisions" is clearly applicable here. *Id.*

After surveying the Court's early precedents, *Gomillion* concluded that although in its dealings with its political subdivisions the state was immunized against certain specified constitutional restrictions, it was bound by a number of others. As the Court stated:

> This line of authority conclusively shows that the Court has never acknowledged

that the States have power to do as they will with municipal corporations regardless of consequences. *Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution.*

*Gomillion*, 364 U.S. at 344–45, 81 S.Ct. at 129 (emphasis added). *Gomillion* added that:

> When a State exercises power wholly within the domain of state interest, it is insulated from judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

*Gomillion*, 364 U.S. at 347, 81 S.Ct. at 130.

*Gomillion* explained that the Court's early cases set forth two relatively simple propositions. First, that as a result of *Dartmouth College*'s early holding regarding the distinction between a contract and a grant of political power, "no constitutionally protected contractual obligation arises between a State and its subordinate governmental entities *solely* as a result of their relationship." *Gomillion*, 364 U.S. at 343, 81 S.Ct. at 128 (emphasis added). Second, that in cases concerning the adverse economic consequences that may result from a state's restructuring of its internal political organization, "the Due Process Clause affords no immunity against mere inequalities in tax burdens, nor does it afford protection against their increase as an indirect consequence of a state's exercise of its political powers." *Id.*

In bringing their Supremacy Clause challenge, the Indian Oasis and Whiteriver School Districts do not seek to enforce either of the constitutional restraints which have traditionally been held inapplicable to relations between states and their political subdivisions. They are neither attempting to use

8. Similarly, *Trenton* concludes that "[t]he power of the State, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'governmental purposes' cannot be questioned." *Trenton*, 262 U.S. at 188, 43 S.Ct. at 537, and *Williams v. Baltimore* states that "[a] municipal corporation, created by the state for the better ordering of government, has no privileges or immunities under the federal constitution which

it may invoke in opposition to the will of its creator." *Williams*, 289 U.S. at 40, 53 S.Ct. at 432.

9. *Gomillion* involved a challenge by individual black voters to the state of Alabama's attempt to redraw municipal boundaries in order to prevent them from voting. *Id.*

the Constitution to enforce an agreement between themselves and the state of Arizona, *cf. Gomillion,* 364 U.S. at 343, 81 S.Ct. at 128 (discussing cases rejecting such suits), nor claiming that a planned state reorganization would violate due process by imposing an inequitable economic burden upon them. *Id.* (same). Moreover, by invoking the Supremacy Clause, the school districts are not raising a constitutional challenge to an exercise of state power that may legitimately be described as one "wholly within the domain of state interest." *Gomillion,* 364 U.S. at 347, 81 S.Ct. at 130. Instead, they are trying to prevent the state from interfering with an agreement that they have entered into with the *federal* government and thus from contravening Congress' intent as to the uses to which *federal* funds should be put.

It is not necessary to decide generally what types of constitutional restraints apply to a state's relations with its political subdivisions and which do not.[10] Here, it is clear that the constitutional restraint in question applies. The Supreme Court has already held that the Supremacy Clause limits attempts by states to regulate the use of federal funds by political subdivisions when such regulation contravenes federal law. *See Lawrence County v. Lead–Deadwood School District,* 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985). That decision is controlling here.

In *Lead–Deadwood,* a school district sought a writ of mandamus to compel a county to distribute federal funds to it in accordance with a state statute. *Lead–Deadwood,* 469 U.S. at 260, 105 S.Ct. at 697. The county raised preemption as a defense, claiming that the state law compelling distribution conflicted with the federal Payment in Lieu of Taxes Act and thus violated the Supremacy Clause. *Id.*

The Supreme Court ruled for the county, holding that the state statute violated the Supremacy Clause. The Court explained that "[t]he strong congressional concern that local governments have maximum flexibility in this area indicates that counties should not encounter substantial interference from the State in allocating funds to the area of greatest need." *Lead–Deadwood,* 469 U.S. at 269, 105 S.Ct. at 702. Thus, *Lead–Deadwood* establishes that localities may invoke the Supremacy Clause to prevent the state from exercising its usual control over the distribution of school funding when federal funds are involved and Congress has specified how they are to be disbursed. Moreover, it reached this conclusion despite the dissenters' contention that *Hunter* forbade such a result. *See Lead–Deadwood,* 469 U.S. at 270–71, 105 S.Ct. at 703 (Rehnquist, J., dissenting).

The fact that in *Lead–Deadwood* the county raised its constitutional claim as a defense

---

10. *See, e.g., Board of Education of Central School Dist. No. 1 v. Allen,* 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 1925 n. 5, 20 L.Ed.2d 1060 (1968) (permitting a school board to sue its state for violating the Establishment Clause); *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980) (White & Marshall JJ. dissenting)(noting that *Allen* conflicts with *South Lake Tahoe's* conclusion that political subdivisions could not sue their state under the constitution); *School Board of the City of Richmond Virginia v. Baliles,* 829 F.2d 1308, 1310 (4th Cir.1987) (granting school board standing to sue its state under the Fourteenth Amendment); *United States v. State of Alabama,* 791 F.2d 1450, 1456 n. 5 (11th Cir.1986) (discussing *Seattle School District* as permitting suits under the Equal Protection Clause); *South Macomb Disposal Authority v. Township of Washington,* 790 F.2d 500, 504 (6th Cir.1986) (suggesting political subdivisions have standing to sue in some circumstances); *Baldwin v. City of Winston–Salem, N.C.,* 710 F.2d 132, 135 (4th Cir.1983) (suggest-

ing that a state may not trench on fundamental rights or discriminate on the basis of race in organizing its internal political structure); *Rogers,* 588 F.2d at 1057 (permitting Supremacy Clause challenges); *Santiago Collazo v. Franqui Acosta,* 721 F.Supp. 385, 393 (D.Puerto Rico 1989) (holding that municipal corporations face no per se standing bar and permitting First Amendment challenge); *Star–Kist Foods,* 227 Cal.Rptr. at 393–94, 719 P.2d at 990–91 (collecting cases and permitting locality to invoke the Commerce Clause). Other courts have concluded that political subdivisions may not bring federal constitutional challenges against their states. *See, e.g., Housing Authority of the Kaw Tribe of Indians v. City of Ponca City,* 952 F.2d 1183, 1188 (10th Cir.1991), *cert. den.,* 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); *Gwinn Area Community Schools v. State of Michigan,* 741 F.2d 840, 844 (6th Cir.1984); *City of New York v. Richardson,* 473 F.2d 923, 929 (2d Cir.), *cert. den.,* 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973).

to a *state* court action is of no consequence in determining the nature of the rights of political subdivisions. While *Lead–Deadwood* does not establish that political subdivisions have *standing* to secure federal-court *jurisdiction* over their constitutional claims, it clearly holds that they may assert a claim of preemption when the state attempts improperly to control their use of federal funds.[11]

Moreover, other courts have expressly concluded that political subdivisions may invoke the Supremacy Clause against their state and may do so by filing actions for declaratory or injunctive relief. *Rogers,* 588 F.2d at 1059; *San Diego Unified Port Dist. v. Gianturco,* 457 F.Supp. 283 (S.D.Cal.1978), *aff'd on other grounds,* 651 F.2d 1306 (9th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982); *see also Star–Kist Foods v. County of Los Angeles,* 42 Cal.3d 1, 227 Cal.Rptr. 391, 393–94, 719 P.2d 987, 990 (1986) (collecting cases). While I do not necessarily agree with all of the reasoning employed in all of these cases, I certainly agree with the result they reach. Accordingly, I would hold that the school districts may assert a cause of action against the state under the Supremacy Clause.

### F.

Finally, the state contends that we may affirm the district court's dismissal of the school districts' preemption claims on other grounds. Principally, the state argues that the nature of the Impact Aid law precludes the school districts from suing to enforce its preemptive effect. This contention is based on two separate but equally erroneous propositions.

The state argues first that by permitting the school districts to enforce the preemptive effect of the Impact Aid Law, we would

somehow be impermissibly affording them a private right of action under that statute. This argument is based on a misunderstanding of the nature of the school districts' challenge. The school districts are suing to enforce the Supremacy Clause, not the Federal Impact Aid Law itself. They do not seek the right to compel the federal government to provide them with Impact Aid funds. Instead, they seek only to prevent the state from enforcing a state law which they contend violates the Impact Aid law and therefore the federal constitution's mandate that federal law take precedence over the conflicting laws of the several states. In such actions, it is the Supremacy Clause itself that provides plaintiffs with the right to sue. As we have stated: " '[t]he best explanation of *Ex Parte Young [*209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws.' " *Guaranty National Insurance Co. v. Gates,* 916 F.2d 508, 512 (9th Cir.1990) (quoting 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3566, at 102 (1984)); *see also Sprint Corp. v. Evans,* 818 F.Supp. 1447, 1453 (M.D.Ala.1993) (same); *Storer Cable Communications v. The City of Montgomery, Alabama,* 806 F.Supp. 1518, 1530 (M.D.Ala.1992) (same).

Moreover, a plaintiff may sue directly under the Supremacy Clause even if the assertedly preemptive federal statute does not provide a cause of action or give rise to enforceable rights that could serve as the basis for a § 1983 suit on preemption grounds. *See Golden State Transit v. City of Los Angeles,* 493 U.S. 103, 107–08, 110 S.Ct. 444, 449–50, 107 L.Ed.2d 420 (1989) (acknowledging the existence of actions for declarato-

---

11. Although in *Lead–Deadwood* a state-created entity rather than the state itself sought to enforce the state statute, that fact does not affect the analysis. The protection that the preemption doctrine affords a political subdivision when it invokes the Supremacy Clause obtains in both cases. Cf. *South Lake Tahoe,* 625 F.2d at 233 (holding that the rule barring political subdivisions from bringing federal constitutional challenges applies whether the defendant is the state itself or a state-created entity).

The majority relies on *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), to dismiss the significance of *Lead–Deadwood.* Maj. op. at 1243. As the majority itself acknowledges, however, *ASARCO* is only relevant to the standing inquiry. It does not alter the importance of *Lead–Deadwood* for determining if the school districts may invoke the Supremacy Clause.

ry relief for preemption outside the context of § 1983 suits); *id.* at 119, 110 S.Ct. at 455 (Kennedy, J. dissenting) (explaining that a § 1983 action for preemption is not necessary because declaratory relief is available even when the preemptive federal statute creates no enforceable rights); *cf. Dennis v. Higgins,* 498 U.S. 439, 462, 111 S.Ct. 865, 879, 112 L.Ed.2d 969 (1991) (arguing that no § 1983 action for violation of the dormant Commerce Clause is needed because of availability of suit for injunctive relief directly under that clause). Thus, my conclusion is unrelated to the question whether the plaintiffs have a private right of action under the statute and, in fact, indicates no view as to whether or not they possess such a right.

The state's second argument is that by including a provision for cutting off Impact Aid funds in non-complying states, Congress intended to preclude plaintiffs from suing to enforce the statute's preemptive effect. This argument proves far too much. Under the state's view, there would never be a cause of action for preemption as long as the preempting statute contained any enforcement or termination provision. The result, of course, would be that the right to sue under the Supremacy Clause would become non-existent, except in the rarest of circumstances. This approach is wholly inconsistent with *Shaw v. Delta Air Lines Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), in which the Supreme Court permitted a suit under the Supremacy Clause to enforce the preemptive effect of the Employee Retirement Income Security Act. Moreover, we have previously permitted plaintiffs to enforce the preemptive effect of the Impact Aid law. *See Carlsbad Union School District of San Diego County v. Rafferty,* 429 F.2d 337, 339–40 (9th Cir.1970) (upholding an action for preemption under the Impact Aid law and discussing other cases that have done so).[12]

Thus, I find no basis for affirming the district court's dismissal of the school districts' action.

## II.

Unlike the school districts, the students do not face any obstacle to establishing their standing by virtue of a special relationship with the state. The only question regarding the students' standing is whether they meet the general constitutional and prudential standing requirements that are applicable to all plaintiffs who seek to establish federal court jurisdiction.

Although the district court recognized that the Supreme Court has conferred standing on students and parents of students "who are directly affected by the laws and practices against which their complaints are directed," *Abington School District v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963), it concluded that *Schempp* did not apply because here the students alleged only that they were "students in the affected school districts" and not that they would suffer any specific injury as a result. The district court concluded that the students were asserting only "generalized grievances," which do not suffice to demonstrate a "personal stake" in the litigation sufficient to satisfy the requirement of "injury in fact". *Warth,* 422 U.S. at 498–99, 95

12. *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) is not to the contrary. In that case, the Court said: "where Congress has prescribed a detailed remedial scheme for the enforcement against a state of a *statutorily created right,* a court should hesitate before casting aside those limitations and permitting an action against a state officer based on *Ex Parte Young." Id.* at ——, 116 S.Ct. at 1132 (emphasis added). While that cautionary note does suggest that it *might* not be proper for us to permit a suit based on *Ex Parte Young* to enforce the Federal Impact Aid Law itself, it is not a bar to permitting a suit to enforce the Supremacy Clause.

Since plaintiffs here are suing to enforce the Supremacy Clause, Congress' ability to abrogate the State's sovereign immunity is not at issue here either, unlike in *Seminole Tribe.* In any event, we note that even were the plaintiffs suing to enforce the Federal Impact Aid Law, 20 U.S.C. §§ 236–244, that law does not implicate the state's sovereign immunity as directly as the Indian Gaming Regulatory Act, the law at issue in *Seminole Tribe.* That Act permitted courts, in response to a suit by an Indian tribe against the state itself, to take action directly against the state. *See* 25 U.S.C. § 2710(d)(7). The Federal Impact Aid Law, by contrast, permits the Secretary to withhold funds from local education agencies, 20 U.S.C. § 240(d)(1).

S.Ct. at 2204–05; *South Lake Tahoe*, 625 F.2d 231 at 237 (citing *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974)). The majority agreed with the district court's analysis.

Both the district court and majority, however, erred in reading the students' complaint. The reviewing court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). So construed, the complaint fairly alleges specific, tangible harms that will befall the students and not simply the fact that the students attend schools in the affected districts.

To be sure, the complaint could have made more specific reference to the individual students' injuries. However, it is not only criminal trials that need not be perfect in this judicial system of ours.[13] Complaints filed by citizens seeking to enforce the Constitution are also entitled to some latitude. The majority views the students' complaint in the most grudging manner conceivable. In the complaint, there are numerous references to injuries—both express and implied—that the student plaintiffs will suffer. The complaint states that "[t]here is no adequate remedy at law to protect Plaintiffs from the harms described in paragraphs 43 through 52." In those paragraphs, the complaint describes specific programs and building projects in the school districts attended by the student-plaintiffs that will be curtailed if A.R.S. § 15–991.02 is enforced. More specifically, the complaint states that Clifford Pablo, Jr. is a student in the Indian Oasis School District who will be "irreparably harmed" because specific building projects and school programs in his district will be curtailed as a result of the state law's enforcement. The complaint also states that David Parker and Nelson Lupe are students in the Whiteriver School District and that 92 percent of the students in the Whiteriver School District benefit from programs that will be impaired by the operation of the challenged state law. To me, the complaint is more than sufficient to allege the requisite injury. As far as I am concerned, there is only one reasonable way to read its allegations, if we analyze the complain in the manner we are supposed to under *Warth v. Seldin*. That way, however, is not the one chosen by the majority when it decides to close the courthouse door to students who seek a fair and equal education for themselves and their schoolmates.

Contrary to the majority's contention, the complaint clearly alleges that Pablo, Lupe, and Parker will be harmed directly because they will be denied the benefit of school programs that will be discontinued or scaled back as a result of the enforcement of the challenged state law. The majority misreads the complaint and relies on selective quotations to conclude otherwise. To say that it reads the complaint ungenerously or with a hostile eye would be an understatement. For instance, paragraph 52 of the complaint alleges:

> The Whiteriver School District and its students will be irreparably harmed by the transfer of its cash balance funds to the County Equalization Fund because the school district must continue to work with grossly inadequate facilities which have a direct impact on the district's ability to function as shown in the attached Exhibits E and J. For example, chronic problems with a more than thirty-year-old boiler at the Middle School threatens Middle School students with loss of heat and/or hot water and cancellation of classes in affected areas.

The majority concludes that the two Whiteriver students fail to allege a concrete injury because the complaint does not indicate "if either of them attends the Middle School where there is a chronic problem with the boiler that additional funds might fix." Majority opinion at 1245. Paragraph 52 of the complaint, however, alleges a chronic boiler problem as merely one example of the many shortcomings in the physical plant of the district, not as the sum total of all its defects. Any possible ambiguity in paragraph 52 is resolved by Exhibit E, which is referenced in the complaint and attached to it. That exhibits says in part, "The architects have con-

---

13. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (per Chief Justice Rehnquist) ("As we have said on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one.").

ducted a deficiency analysis for the district and the district has planned for desperately needed renovations and capital expenditures in *all* of its schools." (emphasis added). Thus it is clear that the problems with the physical plant affect *all* the district's schools and thus *all* of its students, as the complaint alleges. In deciding to dismiss the students' complaint for lack of standing, the majority gives their claims the least reasonable and least generous meaning possible—instead of taking their factual assertions as true and construing the complaint in their favor, as it is required to do on a motion to dismiss. *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2205. In my view, there can be no doubt that the students have properly alleged that they will suffer because they are "schoolchildren ... who are directly affected by the laws and practices against which their complaints are directed." *Valley Forge,* 454 U.S. at 487, 102 S.Ct. at 767 (quoting *Schempp,* 374 U.S. at 224 n. 9, 83 S.Ct. at 1573 n. 9).

That *Schempp* and *Valley Forge* involved challenges by students under the Establishment Clause, while the students' claims in this case arise under the Supremacy Clause, does not affect the analysis. We have previously held that the state's regulation of its public schools may result in injuries to students sufficient to give them standing in a case that did not involve an Establishment Clause violation. *See Johnson v. Stuart,* 702 F.2d 193, 195 (9th Cir.1983) (concluding that students had standing to sue their school board for violating their "first amendment right to free access to information" by limiting the kinds of textbooks that their schools could receive). The critical point is whether the students will suffer injury, not whether the injury that they will suffer is a spiritual or a material one. Because the students' complaint alleges concrete harms that will directly befall them as a result of the enforcement of the challenged state law, they have sufficiently alleged injury-in-fact.

I would also note that the students in a particular school district have an interest in the financial health of that District which cannot be said to be shared even by the other citizens of the county in which the districts are located. *Cf ASARCO, Inc. v. Kadish,* 490 U.S. 605, 612, 109 S.Ct. 2037, 2042, 104 L.Ed.2d 696 (1989) (Kennedy, J.) (explaining

that the relative closeness between municipalities and their taxpayers justifies a more lenient test for establishing municipal taxpayer standing than for establishing state or federal taxpayer standing); *Cammack v. Waihee,* 932 F.2d 765, 770 (9th Cir.1991), *cert. den.,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). In *Gwinn Area Community Schools v. State of Michigan,* 741 F.2d 840, 844 (6th Cir.1984), the Sixth Circuit concluded that a student who alleged that his state was depriving his district of money that it was due under the federal Impact Aid Act had standing to sue the state by virtue of his status as a student in the district, just as taxpayers had standing as a result of their status as municipal taxpayers. After concluding that the school district itself could not sue the state under state law, the court said, "The individual plaintiffs, however do have standing to challenge the state aid formula.... Both the district taxpayer and the district student · are in positions to suffer direct and tangible injuries from the deduction of federal impact aid from state aid payments." *Id.* at 844. It is not necessary, however, to decide that attendance in a school in an affected school district is in itself sufficient to establish Article III standing in the type of action before us, because the students here have alleged particular harms that would befall them, and, on that basis alone, have established sufficient constitutional standing.

Moreover, the students' complaint satisfies the causation and redressability requirements set forth in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992). In *Lujan,* the Court explained that a plaintiff generally faces a more difficult task in establishing standing when the "asserted injury arises from the government's allegedly unlawful regulation ... of *someone* else[.]" *Id.* at 562, 112 S.Ct. at 2137 (emphasis in original). In such a case, the Court concluded that:

> *causation* and *redressability* ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not

before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) (opinion of Kennedy, J.); *see also Simon [v. Eastern Kentucky Welfare Rights Org.], supra,* 426 U.S., [26] at 41–42, 96 S.Ct., [1917] at 1925, 1926 [48 L.Ed.2d 450 (1976)]; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. *E.g., Warth, supra,* 422 U.S., at 505, 95 S.Ct., at 2208. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish. *Allen, supra,* 468 U.S., at 758, 104 S.Ct., at 3328; *Simon, supra,* 426 U.S., at 44–45, 96 S.Ct., at 1927; *Warth, supra,* 422 U.S., at 505, 95 S.Ct., at 2208.

*Lujan,* 504 U.S. at 562, 112 S.Ct. at 2137.

The burden that *Lujan* says that plaintiffs may face when they are not the directly regulated party presents no problem on this appeal. The difficulties that *Lujan* refers to generally involve *proof* of causation and redressability and are more likely to occur at the time of summary judgment or trial. In any event, *Lujan* makes clear that plaintiffs need not "adduce facts" to establish standing at the time of pleading. *Id.* Instead, they need only make "general factual allegations of injury resulting from the defendant's conduct ... for on a motion to dismiss 'we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)). The students' allegations that the enforcement of the state law will lead to the cancellation or curtailment of programs and projects from which they would benefit suffice for purposes of pleading causation and redressability. Accordingly, I would hold that the students have established Article III standing sufficient to survive a motion to dismiss. *See also Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984) (explaining that the inqui-

ry into redressability and causation is similar).

The students satisfy the prudential standing requirements as well. They are arguably within the zone of interests of both the Supremacy Clause, as they challenge the enforcement of an assertedly preemptive state law, *see ANR Pipeline,* 860 F.2d at 1579, and discussion, *supra,* at pp. 1252–1253, and the Impact Aid law, as school children are among the groups of beneficiaries named in the statute. 20 U.S.C. § 236(a)(2); *see also Self–Insurance Institute,* 993 F.2d at 484 (concluding that plaintiffs satisfied the zone of interests test in a Supremacy Clause challenge involving ERISA because the federal statute "specifically enumerated" the plaintiffs). Moreover, the students assert their own interest as students whose educations will be harmed and not that of a third party.

Finally, as I have explained, the students allege a concrete rather than a generalized grievance. They fairly allege specific educational harms that they will suffer as students in their school districts as a result of the state law's enforcement. *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80–81, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595 (1978) (explaining that prudential standing concerns are usually satisfied once constitutional requirements are). The state's reliance on the plurality opinion in *ASARCO* is misplaced. There, the Court concluded that the Arizona Educational Association, a teacher's group, did not have standing to challenge a state law that allegedly deprived the state of funds for public education. *ASARCO,* 490 U.S. at 610, 109 S.Ct. at 2041. The Court concluded that the teachers' standing was based on their interest in the "quality of education in Arizona," a concern which it deemed akin to "the kind of generalized grievances brought by concerned citizens that we have consistently held are not cognizable in the federal courts." *Id.* at 616, 109 S.Ct. at 2045. By contrast, the students here assert far more direct injuries than an adverse affect on their interest in the quality of Arizona's public schools.

Because the students meet both the constitutional and prudential aspects of standing, I would conclude that they meet that jurisdictional requirement.

*III.*

Because I conclude that both the school districts and the students have standing to sue, and because I also conclude that there is no legal barrier to the school districts' assertion of a valid cause of action under the Supremacy Cause, I most respectfully and emphatically dissent. It is regrettable that the majority's erroneous application of standing doctrine prevents the school district and its students from suing to receive the benefits to which they appear to be entitled under federal law.